**UNITED STATES of America, Plaintiff,**

**v.**

**Andre W. AHERN, Defendant.**

No. 93 C 5400.

United States District Court, N.D. Illinois, E.D.

Sept. 9, 1993.

Opinion on Denial of Reconsideration Sept. 23, 1993.

Andre W. Ahern, pro se.

## MEMORANDUM OPINION
## AND ORDER

SHADUR, Senior District Judge.

Andre Ahern ("Ahern") has filed a self-prepared motion under 28 U.S.C. § 2255 ("Section 2255") to vacate, set aside or correct the sentence imposed on him by this Court on March 23, 1992 (a sentence that has once before been reduced pursuant to the former version of Fed.R.Crim.P. ("Rule") 35(b)). Based on its examination of Ahern's motion together with all the relevant files and records relating to the matter, this Court orders the summary dismissal of the motion under Rule 4(b) of the Rules Governing Section 2255 Proceedings in the United States District Courts ("Section 2255 Rules").

■ Ahern's offenses of conviction were sophisticated massive-scale frauds—as his presentence investigation report ("PSI") reflected, the FBI Special Agent in charge of the investigation characterized him as "a schemer" and "manipulative," and the facts that Ahern himself admitted in his plea agreement and in his oral guilty plea are amply corroborative of those characterizations. Before this Court sentenced him, .

Ahern had gone to trial and was convicted by a jury on all six counts of a different fraud indictment in the United States District Court for the Southern District of Illinois. This Court's custodial sentence was imposed concurrently with, rather than consecutively to, the 18–month sentence that had been pronounced by Honorable William Stiehl on those separate and lesser fraud charges.[1]

Before this Court Ahern was represented by counsel who in other cases before this Court (involving both trials and guilty pleas) has demonstrated himself to be a skilled and knowledgeable criminal practitioner.[2] Before Ahern pleaded guilty, he and his counsel had entered into the attached plea agreement (the "Agreement"). In addition to the extended description of Ahern's fraud scheme underpinning his guilty plea to two of the six counts facing him, the Agreement reflected the following:

1. Agreement ¶ 14 set out the government's recommendation of a sentence of three years' incarceration, although the government did not oppose that sentence being made concurrent with the one earlier imposed by Judge Stiehl. Ahern acknowledged not only that the decision as to concurrent or consecutive sentences was solely for this Court to make (*id.*) but also that he could be subject to as much as ten years in prison (Agreement ¶¶ 6 and 17)— it should be noted that this was a pre-Sentencing Guidelines case, so that maximum discretion was vested in this Court in that respect. .

2. Ahern and his counsel agreed with the government that the amount of restitution that Ahern could be ordered to pay to the three companies that were the principal victims of the fraud, if able, was $1.466 million.

---

1. That wire fraud case involved the misappropriation of over $260,000 in trust funds from an insurance business that Ahern had purchased during the latter phase of his nearly $1.5 million fraud scheme involved in this case. That activity of course further corroborated the picture of Ahern as painted in the PSI.

2. That of course does not mean that the same counsel could not be guilty of constitutionally

inadequate representation in Ahern's case in violation of *Strickland v. Washington*, 466 U.S. 668, 687–88, 104 S.Ct. 2052, 2064–65, 80 L.Ed.2d 674 (1984). What it does however suggest is that the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," as taught by *Strickland, id.* at 689, 104 S.Ct. at 2065, is not merely a convenient legal fiction in this instance.

As always, when this Court took Ahern's guilty plea it not only provided him with a detailed explanation of his rights but also went over the terms of the Agreement to make sure that Ahern understood them. And at the time of sentencing both Ahern and his counsel were afforded a full opportunity to deal with any and all relevant issues—and each of them did so at some length.

This Court's original sentence was for Ahern to spend 36 months in the custody of the Attorney General (on the already-mentioned concurrent basis with Judge Stiehl's sentence), to be followed by five years' probation. In addition this Court determined that the appropriate restitution amount was the $1.466 million figure, less any previously-made payments.

Within 120 days after his sentencing Ahern filed a lengthy and timely pro se motion and supporting memorandum under the now-superseded version of Rule 35 (which was still applicable to his pre-Guidelines case), in which he sought modification of both his custodial sentence and the restitution requirement. Through some procedural oversight, the final motion papers were not brought to this Court's attention for some months. But then counsel (a Phoenix, Arizona lawyer, not the lawyer who had initially represented Ahern before this Court) appeared on Ahern's behalf and tendered a supplemental memorandum and other documents in support of the Rule 35 motion. Within a week thereafter (on March 30, 1993) this Court reduced Ahern's custodial sentence to 27 months and reconfirmed all other aspects of the sentence (which thus left intact the post-custodial probationary sentence and the provision as to restitution).

Ahern's current Motion ¶ 9 asserts two grounds for relief, quoted here verbatim:

> *Ground 1:* Defendant was denied his Sixth Amendment right to effective assistance of counsel, during trial and sentencing proceedings; and, during post-conviction proceedings.

> *Ground 2:* Defendant's sentence was imposed in violation of law where his order of restitution is in violation of congressional directive and legislative intent.

Neither of those grounds survives the threshold scrutiny called for by Section 2255 Rule 4(b).

■ As to the first ground, the challenge to effectiveness of Ahern's original counsel in connection with the sentencing proceeding clearly fails. Quite apart from the question of credibility of Ahern's attack on the competence of that original counsel, *Strickland* requires that any defendant making such a claim must demonstrate (1) that his representation at sentencing fell below an objective standard of reasonableness ("outside the wide range of professionally competent assistance," 466 U.S. at 690, 104 S.Ct. at 2066) and (2) that a reasonable probability exists that but for the attorney's unprofessional representation the result of the proceeding would have been different (*id.* at 694, 104 S.Ct. at 2068). But a court need not analyze both prongs of that test, for a defendant's failure to satisfy either prong is fatal to his claim (*id.* at 697, 104 S.Ct. at 2069). Indeed, *Strickland, id.* teaches:

> If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.[3]

■ In this instance the original 36–month sentence (and a fortiori the later-reduced 27–month sentence) would unquestionably have been invulnerable to attack on appeal. *Nothing* suggests that such a sentence fell outside the wide-ranging scope of discretion that was afforded to sentencing courts in the pre-Guidelines era. And as for any potential challenge to the restitution portion of the sentence, perhaps the best answer as to why Ahern's attack would have been doomed to

---

**3.** [Footnote by this Court] Among other reasons for that preference, it avoids the prospect, often required by an inquiry into a lawyer's performance, of invasion of the attorney-client privilege because of the need to inquire into the private conversations between the lawyer and the client (*id.,* 466 U.S. at 691, 104 S.Ct. at 2066).

Moreover, as *Strickland, id.* at 697, 104 S.Ct. at 2069 pointed out:

> Courts should strive to ensure that ineffectiveness claims not become so burdensome to defense counsel that the entire criminal justice system suffers as a result.

failure in all events is afforded by the two-week-old decision from our Court of Appeals in *United States v. Ahmad,* 2 F.3d 245· (7th Cir.1993). At the time of sentencing this Court had reviewed and was thoroughly familiar with the PSI's details about Ahern's college education, his extensive skills and business experience and his "substantial human capital" (*id.* at 247),[4] and it imposed the obligation for full restitution in accordance with what *Ahmad, id.* at 247 described. as "the norm." If anything *Ahmad* teaches that if there were any error by this Court, it was one that ran in *Ahern's* favor, by this Court's not having imposed a fine *in addition to* ordering restitution.[5]

In sum, then, Ahern has not satisfied and could not satisfy the second branch of the *Strickland* inquiry. And that makes it wholly unnecessary to deal with the first branch at all, quite apart from the already-mentioned fact that it appears dubious on its face.

■ Ahern also levels a bogus attack on this Court's Rule 35 ruling, explaining his failure to appeal as attributable to the fact that "the 'jailhouse lawyer' who assisted defendant with his Rule 35 Motion ... failed to

adequately prosecute his motion, and, neglected to inform him of his right to appeal and timely assist him with the appeal." Quite apart from the doubtful premise that any constitutional right to counsel extends to such a post-trial proceeding to begin with, it is of course bizarre for Ahern to claim the ineffectiveness of a *non* lawyer as a deprivation of Ahern's constitutional rights—that route would allow a defendant to choose an incompetent nonlawyer to assist him or her, then to bootstrap that incompetence into a constitutional violation. Moreover, Ahern is strangely silent about the fact that he had an honest-to-goodness lawyer representing him before this Court acted on the Rule 35 motion—and that the lawyer participated both by filing a written memorandum and via oral argument. In short, Ahern's challenge to this Court's Rule 35 determination on constitutional grounds is simply frivolous.[6]

■ As to Ahern's second ground for relief on his current motion, what this Court has already said about *Ahmad* spells finis to that argument. In fact the restitution provision here was in direct furtherance of the law. *Ahmad* at 247, in describing the law applicable to post-Guidelines offenses, says:

4. During Ahern's 11 year period as an executive and then owner of the business that he involved in the fraud scheme in this case, his annual earnings ranged between $120,000 (in the worst years) and $200,000 (in the best years). After that business encountered difficulties (which apparently engendered Ahern's fraudulent activities), Ahern formed a management consulting company from which he drew $6,000 a month. In this Court's view there was every reason to believe that the same entrepreneurial skills that had made Ahern a substantial income producer, and that had also enabled him to acquire ownership of a business rather than remaining an employee, would continue to assure him similar success after he had served his sentence (Ahern was just 45 years old at the time of sentencing). Indeed, that appeared to be buttressed by the post-sentencing letters that were attached to the supplement to Ahern's Rule 35 motion.

5. In that respect this Court eschewed imposition of a fine to maximize the prospects that Ahern could provide as much restitution as possible (that was also the reason that this Court opted to include the maximum five years of post-custodial probation). It should also be remembered that it is only in the post-Guidelines era that the imposition of fines became mandatory "except where the defendant establishes that he is unable to pay

and is not likely to become able to pay the fine" (*Ahmad* at 248 and authorities cited there). In this pre-Guidelines case there was no inconsistency between requiring restitution and omitting a fine in light of the large restitution obligation.

6. It may be noted parenthetically that this Court's reduction of Ahern's custodial sentence to 27 months was directly responsive to the argument that had been made by Ahern and his lawyer that the large amount of his restitution obligation had led to the likelihood, under Parole Board Guidelines, that he would be paroled later than he had expected at the time of sentencing (see Ex. D to Ahern's Rule 35 memorandum, a letter from still another Arizona lawyer directed to Ahern's original Illinois lawyer). Indeed, this Court specifically calculated that the custodial time that Ahern would serve on a 27-month sentence (with time off for good behavior) would be identical to the parole guideline for actual time to be served on a 36-month sentence if restitution of more than $1 million had not been involved. This Court thus effectively granted substantial relief for the collateral consequences of the entirely proper restitution order that it had entered, so to that extent Ahern's current motion really seeks a second round of relief on the same basis—he asks for a double benefit on the identical substantive ground.

Restitution is the norm, and a judge who declines to order full restitution must make explicit findings. 18 U.S.C. § 3553(c). No comparable provision requires findings for ordering restitution. Section 3664(d) says: "The burden of demonstrating the financial resources of the defendant and the financial needs of the defendant and such defendant's dependents shall be on the defendant." Lack of findings coupled with an award of full restitution implies that the defendant has failed to carry this burden.

And the Court of Appeals' referenced language in 18 U.S.C. § 3553(c) is identical to the language in old 18 U.S.C. § 3579(a)(2) applicable to pre-Guidelines offenses (the two provisions set out the same express obligation for the court to state why it did *not* order full restitution), while the Court's referenced language in 18 U.S.C. § 3664(d) is identical to that in old 18 U.S.C. § 3580(d) for pre-Guidelines offenses (both statutes impose the same burden on defendant to negate financial capacity to make restitution). What is crystal clear under those circumstances is that it cannot be said "that the sentence was imposed in violation of the Constitution or laws of the United States," as is required for relief under Section 2255.

In summary, "it plainly appears from the face of the motion and ... the prior proceedings in the case that the movant is not entitled to relief in the district court" (Section 2255 Rule 4(b)). Accordingly it is ordered that the motion be dismissed summarily, and Ahern is being notified of this dismissal.

## ATTACHMENT

### *PLEA AGREEMENT*

No. 91 CR 948

Dec. 10, 1991

Pursuant to Rule 11 of the Federal Rules of Criminal Procedure, the United States of America, by FRED FOREMAN, United States Attorney for the Northern District of Illinois, and the defendant, ANDRE W. AHERN, and his attorney, JEFFREY URDANGEN, have agreed upon the following:

1. Defendant acknowledges that he has been charged in the indictment in this case with mail fraud in violation of Title 18, United States Code, Section 1341.

2. Defendant has read the charges against him contained in the indictment and those charges have been fully explained to him by his attorney.

3. Defendant fully understands the nature and elements of the crimes with which he has been charged.

4. Defendant will enter a voluntary plea of guilty to Counts One and Four of the indictment in this case.

5. Defendant will plead guilty because he is in fact guilty of the charges contained in Counts One and Four of the indictment. In pleading guilty to these counts, defendant acknowledges that:

(a) As charged in Count One of the indictment, at all times material to the indictment, Andre Ahern was a co-owner of Frank A. Cramsie Company (FACC) and sole owner of Financial Assurance Consultants, Inc. (FAC) and these entities were operating in business and commerce as insurance agencies. Beginning in or about 1986 and continuing to approximately October 1987, FACC and FAC were experiencing significant cash shortages and needed additional financing to continue business operations.

To obtain this additional financing, defendant and others devised a scheme whereby legitimate insurance premiums would be double financed with premium financing companies and premiums which had been paid-in-full by insurance clients were illegally financed. In addition, fraudulent and fictitious insurance policies were created and the fictitious premiums were financed with premium financing companies. The premium financing companies included: Monthco Premium Service Company; TIFCO, Inc.; Imperial Premium Finance Company; and Great Lakes Premium Finance, Inc. Defendant acknowledges that the following fraudulent financing was obtained through his scheme to defraud.

In or about September 1986, the defendant personally signed and entered into a $200,000 premium financing agreement with Monthco

Premium Financing Company. The defendant fraudulently represented to Monthco that $250,000 in premiums were owed and would be paid to the Cadillac Insurance Company for a purported errors and omissions policy which purported to provide FACC with $1,000,000 in liability coverage for FACC and its employees.

At all times material to the indictment, Cadillac Insurance Company was not licensed nor authorized to sell errors and omissions policies covering insurance agencies and their employees anywhere in the United States. The defendant and FACC never paid Cadillac Insurance Company for the premiums that were financed by Monthco. Indeed, the Monthco financing proceeds were used by the defendant to continue the operation of his insurance agencies.

Moreover, the defendant created documents purporting to be the underlying Cadillac insurance policies. Although the defendant's signature on the first Cadillac Insurance policy is dated August 2, 1986, the government's evidence would establish that the defendant caused employees of FACC to use a printing service to create the Cadillac Insurance policies and the printing of the policies was not completed until late October 1986.

In or about December 1986, Keller Steel (also doing business as Meadville Forging, Inc.) obtained insurance for its business operations through FACC and sought financing for the premiums owed for these insurance policies. The premiums on these policies amounted to in excess of $300,000. Keller ultimately entered into a premium financing agreement with a financing company. However, the defendant fraudulently double financed the Keller insurance premiums by entering into another premium finance agreement with Monthco and used the $230,000 in proceeds from this financing agreement to continue the business operations of FACC.

In or about January 1987, the defendant directed Howard Lesch, the FACC/FAC agency manager, to prepare a premium financing contract with Monthco on behalf of Third Party Administrators, a company owned, in part, by the defendant. The $300,000 in premiums being financed were for purported errors and omissions insurance coverage issued by Cadillac Insurance Company. The defendant and Third Party Administrators never made any premium payments to Cadillac Insurance Company on this purported insurance policy. The $300,000 in financing provided by Monthco was used by the defendant, without Monthco's knowledge, to finance the business operations of FACC and Third Party Administrators.

In or about January 1987, Howard Lesch, with the knowledge and under the directions of the defendant, double financed the premiums on insurance policies obtained for a client of FACC, New Prime, Inc. On or about January 19, 1987, Monthco issued a check in the amount of $450,000 for premium financing, which Monthco believed was for the benefit of New Prime, Inc. The funds loaned by Monthco were in fact used to continue the business operations of FACC and not for financing New Prime's premiums. In addition, TIFCO also financed $420,000 of the same premiums and the defendant and FACC used the TIFCO financing proceeds for its business operations. Neither Monthco nor TIFCO were informed that New Prime's insurance premiums were not being financed for the benefit of New Prime.

On or about March 1, 1987, the defendant, on behalf of the Arizona branch office of FACC, signed a $200,000 premium financing contract with Monthco. The defendant misrepresented to Monthco that the premium financing was for premiums due on an errors and omissions insurance policy covering individuals employed at the Arizona branch office. The funds loaned by Monthco to FACC were not used to pay premiums, but rather to finance the continuing business operations of FACC.

In or about March and April 1987, FACC obtained insurance coverage for the business operations of Rossi Contractors, an insurance client of FACC. The premiums for this insurance were in excess of $129,000. Rossi Contractors paid these premiums in full and mailed a check for the premiums to FACC. The defendant then used these proceeds in

the business operation of FACC instead of paying the insurance companies. In addition, the defendant directed an employee of FACC to enter into two separate premium financing contracts for the Rossi premiums. Both Monthco and Great Lakes Premium Finance provided financing for these premiums and the defendant used these financing proceeds in the business operation of FACC and to restore the Rossi premium payment which had previously been converted by the defendant.

On or about August 1987, the defendant entered into a $600,000 premium finance agreement with TIFCO. The premiums being financed were for a purported errors and omissions policy issued by the Cadillac Insurance Company covering all the employees of FACC/FAC. The defendant and FACC/FAC never paid any premiums on this purported insurance coverage and the proceeds from the TIFCO financing agreement were used by the defendant to continue business operations.

The specific mailing charged in Count One of the indictment involved the $450,000 in Monthco financing relating to the New Prime insurance coverage. At this time, the defendant and his employees had obtained insurance policies covering the business operations of New Prime, Inc., a client of FACC. These insurance policies required premium payments of approximately $600,000. The defendant fraudulently applied for and entered into two premium financing agreements for the same insurance policies and premiums. One financing company, TIFCO, loaned FACC $420,000 for financing the New Prime insurance premiums. The other financing company, Monthco, loaned FACC $450,000 for financing the same New Prime insurance premiums.

On or about January 19, 1987, Monthco delivered to FACC a check in the amount of $450,000 for financing the New Prime premiums. Because the defendant and FACC were having problems with their Chicago-area bank, the defendant directed that this check should be sent to Florida to be deposited in the trust account of FACC's Florida office so that the funds would be immediately available. On or about January 20, 1987, the defendant caused the mailing of the $450,000 check to Plantation, Florida where it was deposited in a FACC bank account held by the Hanover Bank of Florida.

Pursuant to the defendant's instructions, a FACC employee residing in Florida, issued a $450,000 check made payable to HJL Associates on FACC's account at the Hanover Bank of Florida and mailed this check back to the Northern District of Illinois. HJL Associates was a consulting firm owned by Howard Lesch, FACC's agency manager. The defendant directed Howard Lesch to deposit this check in his HJL Associates account and then use the funds to pay the operating expenses of FACC, as directed by the defendant.

(b) As charged in Count Four of the indictment, the government realleges and incorporates herein the factual summary set forth in the above subparagraph. Because the defendant and FACC/FAC were double financing insurance premiums and financing paid-in-full premiums of legitimate insurance clients, FACC directed Monthco to send billing statement directly to FACC instead of to the insureds who were purportedly financing their premiums, to avoid detection of the scheme to defraud.

In or about April 1987, the defendant and FACC/FAC began missing installment payments on the fraudulent financing agreements detailed above. In late May and June of 1987, the defendant began sending letters to Monthco which assured Monthco that the installment payments would be made current, but falsely explained that it was customers of FACC that were late in paying on the financing agreements. The defendant further assured Monthco that they would not lose any income due to the late installment payments.

As part of the defendant's lulling of Monthco, the defendant requested that Monthco begin calculating "lost interest" on the late and past-due installment payments and sending these interest calculations directly to the defendant at FACC/FAC for payment. In response to the defendant's request, on or about July 2, 1987, John Olin, Vice–President of Monthco, mailed to the

defendant a statement of lost interest on the financing agreements entered into in the names of Frank A. Cramsie Co; HJL Associates; Third Party Administrators; Prime, Inc.; Meadville Forging; and Keller Steel, each of which had past-due installment payments due and owing to Monthco.

On or about October 22, 1987, the defendant was forced to shut-down his business operations. As a result of the defendant's scheme to defraud: Monthco lost approximately $416,000 on the fraudulently obtained premium financing agreements; TIFCO lost approximately $600,000 on the August 1987 premium financing agreement; and Casualty Insurance Company lost approximately $450,000 in insurance premiums that were diverted by the defendant and not paid over to the Casualty Insurance Company for policies produced by FACC/FAC.

6. Defendant understands the counts to which he will plead guilty carry the following penalties:

(a) Count One of the indictment carries a maximum penalty of five years imprisonment and a maximum fine of $2,932,000.

(b) Count Four of the indictment carries a maximum penalty of five years imprisonment and a maximum fine of $2,932,000.

Therefore, the total potential sentence carried under the counts to which defendant will plead guilty is ten years imprisonment, a $2,932,000 fine, as well as any restitution ordered by the Court.

7. The defendant understands that in accord with federal law, 18 U.S.C. § 3013, upon entry of judgment of conviction, the defendant will be assessed $50 on each count to which he has pled guilty, in addition to any other penalty imposed. Defendant agrees to pay the special assessment on the day of sentencing with a $100 check or money order made payable to the Clerk of the U.S. District Court.

8. Defendant understands that by pleading guilty he surrenders certain rights, including the following:

(a) If defendant persisted in a plea of not guilty to the charges against him, he would have the right to a public and speedy trial. The trial could be either a jury trial or a trial by the judge sitting without a jury. The defendant has a right to a jury trial. However, in order that the trial be conducted by the judge sitting without a jury, the defendant, the government and the judge all must agree that the trial be conducted by the judge without a jury.

(b) If the trial is a jury trial, the jury would be composed of twelve laypersons selected at random. Defendant and his attorney would have a say in who the jurors would be by removing prospective jurors for cause where actual bias or other disqualification is shown, or without cause by exercising so-called peremptory challenges. The jury would have to agree unanimously before it could return a verdict of either guilty or not guilty. The jury would be instructed that defendant is presumed innocent, and that it could not convict him unless, after hearing all the evidence, it was persuaded of defendant's guilt beyond a reasonable doubt, and that it was to consider each count of the indictment separately.

(c) If the trial is held by the judge without a jury, the judge would find the facts and determine, after hearing all the evidence, and considering each count separately, whether or not the judge was persuaded of defendant's guilt beyond a reasonable doubt.

(d) At a trial, whether by a jury or a judge, the government would be required to present its witnesses and other evidence against defendant. Defendant would be able to confront those government witnesses and his attorney would be able to cross-examine them. In turn, defendant could present witnesses and other evidence in his own behalf. If the witnesses for defendant would not appear voluntarily, he could require their attendance through the subpoena power of the court.

(e) At a trial, defendant would have a privilege against self-incrimination so that he could decline to testify, and no inference of guilt could be drawn from his refusal to testify. If defendant desired to do so, he could testify in his own behalf.

9. Defendant understands that by pleading guilty he is waiving all the rights set forth in the prior paragraph. Defendant's attorney has explained those rights to him, and the consequences of his waiver of those rights. Defendant understands he is waiving all appellate issues that might have been available if he had exercised his right to trial.

10. Defendant understands that the United States Attorney's Office will fully apprise the District Court and the United States Probation Office of the nature, scope and extent of defendant's conduct regarding the charges against him, and related matters, including all matters in aggravation and mitigation relevant to the issue of sentencing.

11. The defendant agrees that he will cooperate fully with the government in any investigation in which he is called upon to cooperate that is related to or results from the charges in this case. Defendant agrees to provide complete and truthful information to government investigators, including truthful testimony, if called upon to testify, before any federal grand jury and United States District Court proceeding. Defendant further agrees to dismiss his appeal arising from his conviction in the Southern District of Illinois, case number 89–30009–01.

12. Nothing in this agreement shall limit the Internal Revenue Service in its collection of any taxes, interest or penalties from the defendant or his businesses.

13. Defendant understands that the United States Attorney reserves the right to notify any state or federal agency by whom defendant is licensed, or with whom defendant does business, of defendant's conviction.

14. At the time of sentencing, the government will recommend that defendant be incarcerated in a penal institution for a term of incarceration of three years. The government will not oppose the sentence in the instant case being served concurrently with the defendant's sentence imposed in the Southern District of Illinois, case number 89–30009–01. However, defendant understands that the decision to have the sentences run concurrently rests solely with the Court. If the Court does not order that the sentence in this district run concurrently with the previously imposed sentence, defendant acknowledges that this is not a basis for withdrawing his guilty plea to the instant federal offense.

The defendant further understands that the provisions of this paragraph govern the sentencing recommendation only during the Rule 32 (or initial) sentencing proceeding, and do not apply or limit the government in the event the defendant subsequently moves to reduce or modify his sentence.

15. The parties agree that the amount of restitution which the defendant could be ordered to pay to Monthco, TIFCO, and Casualty Insurance Company, if able, is $1,466,000. The defendant understands that Title 18, United States Code, Sections 3663 and 3664 set forth the factors to be weighed in setting restitution in this case. The defendant agrees to provide truthful information to the Court and United States Probation Officer regarding all details of his economic circumstances in order to determine the proper restitution which the defendant may be ordered to pay. Defendant understands that providing false or incomplete information may be prosecuted as a violation of Title 18, United States Code, Section 1001, or as a contempt of the Court.

16. Defendant and his attorney acknowledge that no threats, promises, or representations have been made, nor agreements reached, other than those set forth in this agreement, to cause defendant to plead guilty. Defendant understands that his compliance with each part of this plea agreement extends throughout and beyond the period of his sentence, and failure to abide by any term of the plea agreement is a violation of the agreement rendering it null and void. Defendant further agrees this plea agreement shall be filed and become a part of the record in this case.

17. It is understood by the parties that the sentencing judge is neither a party to nor bound by this agreement and is free to impose the maximum penalties as set forth in paragraph six above. The defendant acknowledges that if the Court does not accept the sentencing recommendations of the parties, the defendant will have no right to withdraw his guilty plea.

18. After sentence has been imposed on the counts to which defendant pleads guilty as agreed herein, the government will move to dismiss the remaining counts of the indictment.

19. Should the judge refuse to accept the defendant's plea of guilty, this agreement shall become null and void and neither party will be bound thereto.

FRED FOREMAN

United States Attorney

MATTHEW BETTENHAUSEN

Assistant United States Attorney

ANDRE W. AHERN

Defendant

JEFFREY URDANGEN

Attorney for Defendant

## MEMORANDUM OPINION AND ORDER ON RECONSIDERATION

Andre Ahern ("Ahern") has just filed a motion for this Court's reconsideration and vacation of its September 7, 1993 memorandum opinion and order (the "Opinion"), in which this Court dismissed Ahern's 28 U.S.C. § 2255 ("Section 2255") motion attacking his already-once-reduced sentence. For the reasons briefly stated here, Ahern's current motion is denied.

In substantial part Ahern really complains of this Court's having adhered to the procedure that is expressly prescribed by Rule 4(b) of the Rules Governing Section 2255 Proceedings in the United States District Courts ("Section 2255 Rules"):

The motion, together with all the files, records, transcripts, and correspondence relating to the judgment under attack, shall be examined promptly by the judge to whom it is assigned. If it plainly appears from the face of the motion and any annexed exhibits and the prior proceedings in the case that the movant is not entitled to relief in the district court, the judge shall make an order for its summary dismissal and cause the movant to be notified.

And that Rule in turn implements the express terms that have been set out by Congress in Section 2255 itself (emphasis added):

Unless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall cause notice thereof to be served upon the United States attorney, grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law with respect thereto.

Thus both Section 2255 and Rule 4(b) mandate the type of initial judicial scrutiny reflected in the Opinion, and mandate with equal force the threshold dismissal of any Section 2255 motion that cannot survive that scrutiny as a matter of law.

■ It is simply not true, as Ahern asserts at page 3 of his current memorandum, that he "inherently possesses the due process right to file an action with this Court and subsequently file an argument which would exhaustively set forth the factual basis legally supporting movant's claims." In that sense this proceeding is not akin to the standard that is set out in *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957) for Fed.R.Civ.P. 12(b)(6)· dismissals, as quoted by Ahern at his Mem. 2 n. 2—for this Court is *not* duty bound to accept Ahern's allegations in the teeth of clear record evidence to the contrary.[1]

What Ahern refuses to recognize is that he has received due process of law in the real sense of that concept: He has been afforded all the process that is his due. There is no need to repeat (or to attempt to summarize accurately in brief compass) what this Court has said at length in the Opinion. Both

---

1. In that respect there is a meaningful difference between a petition for writ of habeas corpus or under 28 U.S.C. § 2254, either of which targets a *state court* conviction, and a motion under Section 2255—which normally challenges a conviction or sentence that took place before the same federal judge to whom the motion to vacate has been presented (see Section 2255 Rule 4(a)). In the first instance, the matters set out by the petitioner cannot be (by definition) at war with matters within the personal knowledge of the federal judge considering the case. In Section 2255 proceedings, by contrast, there is no reason to afford a movant the opportunity for an evidentiary hearing on matters that have taken place in open court before the very judge who is ruling on the motion.

facets of Ahern's Section 2255 motion did not survive threshold scrutiny in legal terms—the first facet because he was doomed to fail on the second ("prejudice") branch of the *Strickland v. Washington* formulation (thus mooting the first ("cause") branch, on which an evidentiary hearing might have been required), and the second facet because it unquestionably involved a pure question of law (one so recently ruled upon by our Court of Appeals in *United States v. Ahmad,* 2 F.3d 245 (7th Cir.1993)). Hence there was plainly no need for an evidentiary presentation on either ground advanced by Ahern.

Indeed, to return briefly to Ahern's first ground, the Opinion may well have given Ahern *more* than his due in legal terms. Most recently the Supreme Court has framed the second ("prejudice") branch of the *Strickland* inquiry in a somewhat narrower fashion (*Lockhart v. Fretwell,* —— U.S. ——, ——, 113 S.Ct. 838, 844, 122 L.Ed.2d 180 (1993)):

> It focuses on the question whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair. Unreliability or unfairness does not result if the ineffectiveness of counsel does not deprive the defendant of any substantive or procedural right to which the law entitles him.

En route to that restatement the Court said (*id.* at —— – ——, 113 S.Ct. at 842–43 (footnote omitted)):

> Thus, an analysis focusing solely on mere outcome determination, without attention to whether the result of the proceeding was fundamentally unfair or unreliable, is defective. To set aside a conviction or sentence solely because the outcome would have been different but for counsel's error may grant the defendant a windfall to which the law does not entitle him.

And see our Court of Appeals' current decision in *Durrive v. United States,* 4 F.3d 548, 550 (7th Cir.1993), which characterizes *Lockhart* as "reject[ing] the equation between causation [in the but-for sense] and prejudice."

In summary, nothing that Ahern now sets out in his motion for reconsideration requires a fresh look at, let alone the vacation of, the Opinion. Ahern's current motion is denied.